183 So. 894

**MULLINS v. STATE.**

8 Div. 665.

Court of Appeals of Alabama.

June 21, 1938.

Rehearing Denied June 30, 1938.

J. N. Powell, of Hartselle, and Newton B. Powell, of Decatur, for appellant.

A. A. Carmichael, Atty. Gen., and Silas C. Garrett, III, Asst. Atty. Gen., for the State.

RICE, Judge.

Appellant, who had reached his three score years and ten, lived alone in a rented room up over one of the stores in Decatur, Alabama.

His friend Ed McDermott, the deceased, was well past his "three score years",—in fact, near the half-way mark toward the "ten."

Ed fell on evil days; apparently, had nowhere to stay; and appellant "took him in."

For some one year and a half, prior to the day which sets us writing, Ed had occupied appellant's room as an invited, non-paying, guest—appellant all the while, as we gather from the testimony, furnishing, free of charge, the food that Ed ate.

But the picture was disturbed. One day the old man who is the appellant, as it seems was his wont, "got tight"—by which we mean he took on board too much intoxicating liquor.

This little spree of his occurred in the morning of the day in question. And it seems that appellant, a bit frugal minded, realizing his inebriated condition, at that time, turned over his money to a friend to keep for him.

Then appellant, who was not only an old man, "tight," but sick besides, forgot what he had done with his money.

As the afternoon of this fateful day came, and wore on, appellant went up to his room and went to bed—about four o'clock, as he tells it. He says he went to sleep, and woke about nine o'clock that night, when Ed McDermott came into the room.

Perhaps we should have said, above, that while Ed had no bed in the room—he refusing, according to appellant, to "have a bed"—preferring to sleep on a "big carpet spread down and a quilt or two on the floor," yet appellant had had made, and had given to Ed, a key to the door of the room, so that he "could come in by day or night, and have free access"—as appellant expresses it.

As appellant woke, upon the entering of the room by Ed on this night in question—was perhaps awakened by Ed's entrance—he felt the urge to eat.

And then what took place cannot be more graphically described than by quoting appellant's own language, as used while testifying as a witness in his own behalf, on the trial resulting, eventually, in this appeal. It follows, to-wit:

"When I woke up and he was standing in the room, I hadn't eaten anything that day, and I got up and turned the sheet back— I asked him, I says, 'Ed, are you in shape to go down and get me a peach pie and a bottle of milk?' I says, 'I am sick and need something to eat.' He says, 'I reckon I am,' and I opened my pocket book, and I knew that I had twenty-one dollars in my pocket book when I lay down—supposed I did, and when I looked in there, I did not have the money, and I spoke to him, I says, 'Ed, my money is gone.' 'Well,' he says, 'You intimate that I got your money.' 'Well,' I says, 'I don't know who got it, but I am twenty-one dollars out, and I don't know where it is, and you are the only man that has got a key to my door,' and when I said that, he grabbed this poker and said, 'Well, I have got enough of this, and I will just stop that part of it now,' and grabbed this rod; and my gun was laying right there, I just grabbed the gun—I was sitting on the side of my bed with my pocket book in my hand when he grabbed the rod; I was in my night clothes; he grabbed the rod, and said: 'I have got enough of this damn stuff' and he grabbed the rod, and when he did, the gun was the only thing I had there, and I was sick and weak, and I grabbed the gun in my right hand, that way (indicating), and rushed to him..

* * * * * *

"I was grabbing at the rod, trying to get hold of the rod to take it away from him,

and when I was grabbing at the rod, it is one of those Lemon Squeezers, I must have touched the trigger some way.

\*     \*     \*     \*     \*     \*

"The first I knew of the gun going off, I saw the flash all over the room. I was grabbing at his arm; we were scuffling around the room; I was trying to save myself; when the gun went off, his hand dropped down that way (indicating), I grabbed the rod then, and got it way from him, and I took the rod and laid it over at the corner of the table, and I threw the pistol over on the bed."

(It might be explained that the "Lemon Squeezer" referred to is described in the testimony as a pistol of which you "squeeze the handle and pull the trigger and it fires —that is the same as cocking it").

Ed was shot—as described—and died as a result thereof.

Appellant was put on trial under an indictment charging him with the offense of murder in the first degree; was convicted of the offense of manslaughter in the first degree, and his punishment fixed at imprisonment in the penitentiary for the term of ten years.

Upon his trial, not denying that he shot and killed his friend, he advanced two theories as to why he should not be convicted: One, that the shooting was done in self-defense, as that term is known to the law; and the other that the shot that was fired was the result of a pure accident—due to the "mechanical idiosyncracies" of the "lemon squeezer."

█ But no principle of the law is better established than that one cannot rely upon the plea of self-defense in justification of a blow struck (fatal shot fired) during a rencounter which he provoked. Scoggins et al. v. State, 120 Ala. 369, 25 So. 180. Nor do we see how it can be contended that the language used by appellant to deceased just prior to the rencounter here under examination: "I don't know who got it, but I am twenty-one dollars out, and I don't know where it is, and you are the only man that has got a key to my door" was not language calculated to provoke a difficulty.

█ The trial court, to our mind, was charitable to appellant when he cut him off

from the benefit of his plea of "not guilty by reason of self-defense" only in the event the jury should find that the said language of appellant was such as, by its nature, was calculated to bring on the difficulty. The learned court might well, in our opinion, have charged the jury that the language in question was such language.

█ As for appellant's claim that his shooting of deceased was accidental, there seems no fault to find with the way and manner in which the issue thus raised was submitted to the jury for its decision. The instructions in that regard were full, fair, and accurate.

We have examined the rulings underlying the various exceptions reserved on the taking of testimony. In each instance where exception was properly reserved we find the ruling either correct or, so far as harm to appellant is concerned, innocuous.

█ The trial court's oral charge was unusually explicit, and careful of appellant's rights. When read in connection with the large number of written charges given at appellant's request, it is apparent that no applicable principle of law was omitted, or stated in a way working prejudice, erroneously, to appellant's defense. This in itself was sufficient reason for the refusal to give any of the written charges appearing to have been requested by and refused to appellant,—not meaning by this to intimate that there would have been error, otherwise, in the refusal of any one of such charges.

We have no brief on behalf of appellant; but we have endeavored to perform our full duty under the terms of Code 1923, Sec. 3258, by considering "all questions apparent on the record or reserved by bill of exceptions." We cannot find, anywhere, error of a nature for which the judgment should be reversed.

It seems to us a very tragic case. Appellant, old, infirm, sick, but who bore a good reputation, killed a man whom apparently he loved. And all because of a ghastly mistake.

But the rules of law are inexorable. He had their full benefit. And must suffer their full penalty.

The judgment is affirmed.

Affirmed.